# ORIGINAL



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GARY HILL and WANDA HILL,

      Plaintiffs,

v.

THOMAS E. WINTER;

JOEL CONSTRUCTION COMPANY;
and BUILDING TRENDS, INC.

      Defendants.

CIVIL ACTION FILE
NO.   **1 05-CV 2026**

**JURY DEMAND**

**-GET**

## COMPLAINT

Plaintiffs, GARY HILL and WANDA HILL (the "Hills"), state their complaint against Defendants, THOMAS E. WINTER ("Winter"), JOEL CONSTRUCTION COMPANY ("Joel"), and BUILDING TRENDS, INC. ("BTI") as follows:

## PARTIES, JURISDICTION AND VENUE

### 1.

Defendant Winter is an individual residing in Georgia and may be served with process at 4095 River Green Parkway, Duluth, Georgia 30096



2.

Defendant Joel is a corporation incorporated in the state of Georgia and may be served through its registered agent. Jim Joel, at 1191 Cory Circle, Greensboro, Georgia 30642.

3.

Defendant BTI is a corporation incorporated in the state of Georgia and may be served through its registered agent, Gregory R Crochet, at 225 Peachtree Street NE, #2100 South, Atlanta, Georgia 30303.

4.

Plaintiffs, Gary Hill and Wanda Hill, are individuals residing at 8509 River Club Way, Knoxville, Tennessee 37922.

5.

This Court has jurisdiction over this action by virtue of the diversity of citizenship between the parties pursuant to 28 U S.C. § 1332. The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.

Venue is proper in this district pursuant to 28 U S C. § 1391(a)(1), as at least one of the defendants resides herein, and pursuant to 28 U.S.C. § 1391(a)(2), as a

substantial part of the events giving rise to the claims occurred herein and the property that is the subject of this action is situated herein.

## FACTUAL BACKGROUND

7.

On or about September 1, 1999, an individual named Gene Venesky ("Venesky") acquired a certain unimproved piece of real property known as Lot 439 in Sugarloaf Country Club, at 3300 Moye Trail, Duluth, Gwinnett County, Georgia 30097 (the "Property").

8.

Upon information and belief, Venesky is a business associate and social acquaintance of Defendant Winter.

9

Upon information and belief, neither Thomas Winter nor Building Trends, Inc., a Georgia Corporation for whom Winter serves as President and CEO, is an approved builder for the Sugarloaf Country Club subdivision where the Property is located.

10.

Upon information and belief, Venesky nonetheless hired Winter and BTI to construct a home on the Property

11.

Upon information and belief, Winter. BTI and Venesky paid Joel, an approved builder in the Sugarloaf Country Club subdivision, to procure the building permit for the home from Gwinnett County

12

On or about June 27, 2000, Joel applied for. and subsequently was issued, a building permit in Gwinnett County for the construction of the home

13.

Upon information and belief, Winter, BTI. Venesky and Joel acted with the intent and knowledge that Winter and/or BTI would actually construct the home and that Joel would not.

14.

Upon information and belief, no building permit has ever been issued in Gwinnett County for the Venesky home in the name of BTI or Winter.

15.

Upon information and belief, Venesky paid Winter and/or BTI to perform construction on the home, under Joel's permit, starting sometime in the year 2000

16

Winter and/or BTI never completed the construction of the home for Venesky.

17.

On or about September 20, 2003, the Hills and Winter executed a contract (the "First Contract") regarding the purchase of the Property, including the partially constructed home thereon, known as Lot 439 in Sugarloaf Country Club, at 3300 Moye Trail, Duluth, Gwinnett County, Georgia 30097   A true and accurate copy of the First Contract is attached hereto as Exhibit "A."

18.

Pursuant to the First Contract, a $300,000 deposit was to be paid to BTI on September 20, 2003; a loan, in the amount of $200,000 was to be funded to Winter in the form of a non-recourse loan at closing; a purchase price for the Property in the amount of $2,250,000 was to be paid at the closing of the purchase of the

Property, and a remodeling contract was to be entered into on or before closing, providing for the remodeling and completion of construction.

19.

On or about September 22, 2003, the Hills and BTI entered into a New Construction Purchase and Sale Agreement for the Property in the amount of $2,250,000 (the "Purchase Contract"). A true and accurate copy of the Purchase Contract is attached hereto as Exhibit "B."

20.

The Purchase Contract included an express special stipulation requiring that the Hills, as Buyer, and BTI, as Seller, draft and execute a "Remodeling Contract" in the amount of $900,000 for the construction of certain work necessary to complete the home on the Property. The execution of the Remodeling Contract and full payment of the $900.000 on or before closing was a condition precedent to the validity of the Purchase Contract

21.

Pursuant to the First Contract, the Hills paid the deposit of $300,000 to BTI and made the loan of $200,000 to Winter

22.

Pursuant to the Purchase Contract, the Hills paid at closing the purchase price of $2.250,000 to BTI and an additional amount of $900,000 to BTI, for a total of $3,150,000.00. Of this total, $250,000 remains in escrow   However, BTI and Winter failed to draft or execute a "Remodeling Contract."

23.

Upon information and belief, after the Hills and Winter signed the various contracts, and shortly before closing, Venesky conveyed the Property to BTI by quit claim deed.

24.

On or about December 29, 2003, Winter and BTI delivered a Warranty Deed for the Property to the Hills as joint tenants.

25

Between December 29, 2003, and approximately March, 2004, Winter and BTI performed limited construction work on the Property

26.

In approximately March of 2004. Winter and BTI abandoned work on the Property, leaving the partially constructed home incomplete, uninhabitable and exposed to the elements.

1530971                                         - 7 -

27.

No certificate of occupancy has ever been issued for the Property and the Hills have been prevented from occupying the home.

28.

The Hills have discovered that much of the construction work performed on the Property by Winter and BTI is defective and fails to comply with applicable building codes and contractual standards. Examples of defective work include defective cabinetry and trim, defective sheetrock and painting, defective exterior stucco work, defective roofing, various structural deficiencies, various other architectural deficiencies, and generally improper and incomplete electrical, plumbing and HVAC systems. Several of these defects have resulted in moisture intrusion, water damage, mold and mildew.

29.

Plaintiffs have incurred substantial unanticipated costs and expenses for testing, evaluation and necessary remediation of certain portions of the afore-mentioned defective work.

30

Upon information and belief, Winter intentionally and knowingly misrepresented that BTI or Winter himself were approved, qualified and permitted

by Gwinnett County to perform the construction on the Property.   In the alternative, upon information and belief, Winter knowingly and recklessly failed or refused to disclose that BTI or Winter himself were not approved, qualified and permitted by Gwinnett County to perform construction work on the Property Upon information and belief, Winter did so with the intent to induce the Hills to enter into the various contracts to purchase and complete the Property.

31.

The Hills justifiably relied on Winter's inaccurate and misleading representations and disclosures and entered into the various contracts. The Hills fully performed their obligation by funding Winter and BTI $3,650.000.00.

32.

The Hills have been irreparably damaged by Winter's actions and are currently the owners of an incomplete multi-million dollar house that cannot be inhabited and will require substantial sums for repair and completion before it can be inhabited or marketed for sale.

33.

Winter and BTI have never repaid the $200,000 loan, refunded the $300,000 deposit, nor refunded the $900,000 paid for the remodeling contract. Winter and

BTI have never refunded any other amounts paid to them by the Hills for work that has never been properly performed by Winter or BTI.

## COUNT I
## BREACH OF CONTRACT AGAINST WINTER AND BTI

34.

Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 33 as if fully restated herein.

35

Winter and/or BTI accepted $900,000 from the Hills for a "Remodeling Contract" that was necessary to complete the construction of the home. Winter and/or BTI accepted $500,000 from the Hills under the First Contract

36.

Winter failed to perform the necessary construction on the Property in a proper and workmanlike manner, failed to perform the construction in accordance with applicable building codes and industry standards, failed to perform the construction with the quality and finish comparable to other homes in the Sugarloaf Community, and failed to complete the construction for which Winter has been paid.

37.

Winter and/or BTI accepted $900,000 for the "Remodeling Contract" that was never presented to or executed by the Hills, failed to complete the construction of the Hill's home on the Property and failed to deliver a certificate of occupancy for the home.

38.

Therefore, Winter breached the contracts for which he accepted full payment from the Hills and is liable for all damages incurred by the Hills as a result of such breaches, in an amount to be shown at trial, but not less than $1,700,000.00.

## COUNT II
## NEGLIGENT CONSTRUCTION AGAINST
## BTI, WINTER AND JOEL

39.

Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 38 as if fully restated herein

40.

BTI performed the construction work at the Property.

41

Winter, as an officer of BTI, personally took part in, directed, and supervised the construction work performed at the Property

42.

Said construction work was defective, performed in a negligent manner and never completed.

43.

Winter and BTI are therefore liable for all damages incurred by the Hills as a result of the negligent construction in an amount to be determined at trial but not less than $1,700,000.00.

44.

Joel applied for and was issued the building permit by Gwinnett County under which the construction was performed

45.

Joel, as the permitted builder, is responsible under the permit for ensuring that all construction is performed in accordance with the applicable building codes.

46.

Much of the work performed was defective and in violation of applicable building codes.

47.

Joel is therefore liable for all damages incurred by the Hills as a result of the negligent construction in an amount to be determined at trial but not less than $300.000 00.

## COUNT III
## UNJUST ENRICHMENT AGAINST BTI AND WINTER

48

Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 47 as if fully restated herein.

49.

Plaintiffs paid the entire requested price of $3,650,000 to Winter and BTI for the Property and a properly and completely constructed home located thereon.

50

Plaintiffs made such payments in good faith fulfillment of their obligations, yet Plaintiffs have not received the full consideration or benefit for such payments

due to the failure of Winter and BTI to complete the construction in a proper and workmanlike manner.

51.

Winter and BTI, however, have benefited from Plaintiffs' payments and have been unjustly enriched as a result.

52.

Winter and BTI are therefore liable to Plaintiffs in an amount to be shown at trial, but not less than $1,400,000 00.

## COUNT IV
## FRAUD AGAINST WINTER

53.

Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 52 as if fully restated herein.

54.

Upon information and belief, Winter, BTI, Venesky, Joel and other parties made, either directly or indirectly, knowingly false representations to Plaintiffs, or intentionally and recklessly concealed information, with the intent to induce Plaintiffs into purchasing the Property.

55.

Plaintiffs justifiably relied on the representations of Winter and others and have been damaged as a result

56

Winter is therefore liable to Plaintiffs for fraud in an amount to be shown at trial.

57.

Winter's fraudulent conduct was willful and in bad faith and warrants an award of punitive damages

## COUNT V
## CIVIL CONSPIRACY TO DEFRAUD AGAINST WINTER, BTI AND JOEL

58

Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 57 as if fully restated herein.

59.

Upon information and belief, Winter, BTI, Venesky, and Joel jointly conspired to fraudulently procure a false building permit to allow Winter and BTI, unapproved and incompetent builders, to construct the home

60.

Winter, BTI, Venesky, Joel and other parties then made, either directly or indirectly, knowingly false representations to Plaintiffs, or intentionally and recklessly concealed information, with the intent to induce Plaintiffs into purchasing the Property

61.

Plaintiffs justifiably relied on the representations of Winter and others and have been damaged as a result.

62.

Winter, BTI and Joel are therefore liable to Plaintiffs for their fraudulent acts, as well as the fraudulent acts of their co-conspirators, Winter, BTI, Venesky and others, in an amount to be shown at trial.

63.

Winter, BTI and Joel's fraudulent conduct was willful and in bad faith and warrants an award of punitive damages

## COUNT VI
## ATTORNEYS' FEES

64.

Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 63 as if fully restated herein.

65

Winter, BTI and Joel have acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense, and, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recover their expenses of litigation, including reasonable attorney's fees, from Winter, BTI and Joel.

WHEREFORE, Plaintiffs, GARY HILL and WANDA HILL, respectfully pray as follows.

(a)     that Plaintiffs have a trial by jury,

(b)     that judgment be issued in Plaintiffs' favor on Count I and against Defendants Winter and BTI for Breach of Contract in an amount to be proved at trial, but not less than $1,700.000, plus interest at the highest rate otherwise allowed by law,

(c)     that judgment be issued in Plaintiffs' favor on Count II and against Defendants Winter, BTI and Joel for Negligent Construction in an amount to be proved at trial, but not less than $1,700,000;

(d)     that judgment be issued in Plaintiffs' favor on Count III and against Defendants Winter and BTI for Unjust Enrichment in an amount to be proved at trial, but not less than $1,400,000;

(e)     that judgment be issued in Plaintiffs' favor on Count IV and against Defendant Winter for Fraud in an amount to be proved at trial, plus punitive damages in such an amount as a fair and impartial jury may determine;

(f)     that judgment be issued in Plaintiffs' favor on Count V and against Defendants Winter, BTI and Joel for Civil Conspiracy to Defraud in an amount to be proved at trial, plus punitive damages in such an amount as a fair and impartial jury may determine;

(f)     that judgment be issued in Plaintiffs' favor on Count VI and against Defendants Winter, BTI and Joel for Plaintiffs' expenses of litigation and reasonable attorneys' fees pursuant to O.C.G.A. § 13-6-11; and

(g)     that the Court award Plaintiffs such other and further relief as it deems necessary in the interest of justice.

This ___ day of August, 2005.

_____
William W Hopson
Georgia Bar No. 366729
J. David Mura, Jr.
Georgia Bar No. 529888
Attorneys for Plaintiffs
Gary Hill and Wanda Hill

TROUTMAN SANDERS LLP
Bank of America Plaza
Suite 5200
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
Ph   (404) 885-3300
Fax: (404) 885-3900

# EXHIBIT A

9-20-03

Agreement:                              $ 3.650,000.00

Between Gary Hill & Tom Winter For
Bldg. Trends.

For Consideration of $ 500,000 ºº paid
to TW & Bldg. Trends. As option
to purchase SL Lot 939. For the
Sum of $ 2.250,000 And A Remodel
Contract. of Totaling 900,000 ºº
Sales Commission to be Paid by. B.T.I. Seller.
$ 500.000 Paid As Follows. 9-20-03
→ $ 300,000 to BTI in Form of Non
Refundable Deposit if Buyer Fails to
Close And $ 200,000 Paid to Tom Winter
in Form of Non Recorse Loan when
House Closes.

House to Close on or Before
Nov. 15, 2003

Change orders to be Approved And
Signed by both parties,

Tom Winter
Gary Hill.
Wanda Hill

**EXHIBIT A**

# EXHIBIT B



**NEW CONSTRUCTION PURCHASE AND SALE AGREEMEN** 🏠

RESIDENTIAL BROKERAGE

Date: _____ **September 22** _____ , 20 **03** _____

**2002 Printing**

1 **Purchase and Sale.** The undersigned buyer ("Buyer") agrees to buy and the undersigned seller ("Seller") agrees to sell all that tract or parcel of land, with such improvements as are located thereon, described as follows  All that tract of land lying and being in Land Lot __**164**__ of the _____**7**_____ District, _____**D**_____ Section of _____**Gwinnett**_____County, Georgia, and being known as Address _____**3300 MOYE TRAIL**_____, City _____**Duluth**_____, Zip Code __**30097**__, according to the present system of numbering in and around this area, being more particularly described as Lot __**439**__, Block _____**13B**_____, Unit _____, Phase/Section _____**D**_____ of **SUGARLOAF COUNTRY CLUB** subdivision, as recorded in Plat Book _____**0**_____, Page __**0**__, _____**Gwinnett**_____County, Georgia, records together with all fixtures, landscaping, improvements, and appurtenances, all being hereinafter collectively referred to as the "Property"  The full legal description of the Property is the same as is recorded with the Clerk of the Superior Court of the county in which the Property is located and is made a part of this Agreement by reference

2. **Purchase Price and Method of Payment.** Buyer warrants that Buyer will have sufficient cash at closing, which when combined with the loan(s), if any, referenced herein, will allow Buyer to complete the purchase of the Property  Buyer does not need to sell or lease other real property in order to complete the purchase of the Property  The purchase price of the Property to be paid by Buyer at closing is **Two Million Two Hundred Fifty Thousand** _____U S Dollars, $ **2,250,000** _____, subject to the following  *[Select sections A, B, C, and/or D below  The sections not marked are not a part of this Agreement ]*

☒ **A. All Cash At Closing:** At closing, Buyer shall pay the purchase price to Seller in cash, or its equivalent  Buyer's obligation to close shall not be subject to any financial contingency  Buyer shall pay all closing costs

☐ **B. Loan To Be Assumed:** See Exhibit "_____"

☐ **C  New Loan To Be Obtained:** This Agreement is made conditioned upon Buyer's ability to obtain a loan (except if the loan is denied because Buyer lacks sufficient cash to close excluding the amount of the loan and/or because Buyer has not sold or leased other real property) in the principal amount of _____% of the purchase price listed above, with an interest rate at par of not more than _____% per annum on the unpaid balance, to be secured by a first lien security deed on the Property, the loan to be paid in consecutive monthly installments of principal and interest over a term of not less than _____ years  "Ability to obtain" as used herein means that Buyer is qualified to receive the loan described herein based upon lender's customary and standard underwriting criteria  The loan shall be of the type selected below  *[The sections not marked are not a part of this Agreement ]*
  (1) Loan Type·  ☐ Conventional,    ☐FHA (see attached exhibit),    ☐VA (see attached exhibit) ,    ☐ Other (see attached exhibit)
  (2) Rate Type  ☐ Fixed Rate Mortgage Loan,   ☐ Adjustable Rate Mortgage ("ARM") Loan,
  (3) Closing Costs and Discount Points  Seller shall, at the time of closing, contribute a sum not to exceed $ **.00** _____ to be used by Buyer to pay for  (a) preparation of the warranty deed and owner's affidavit by the closing attorney, (b) at Buyer's discretion, closing costs, loan discount points, survey costs, and insurance premiums (including flood insurance, if applicable) relating to the Property or loan, and (c) at Buyer's discretion, other costs to close including escrow establishment charges and prepaid items, if allowed by lender  Buyer shall pay all other costs, fees, and amounts for the above-referenced items and to fulfill lender requirements to otherwise close this transaction
  (4) **Closing Attorney:** This transaction shall be closed by the law firm of_____**Jill Elliott**_____ _____  If Buyer is given the right to select a law firm from a mortgage lender's approved list of closing attorney's, Buyer agrees to select the above-named firm  If the above-named firm is not on the mortgage lender's approved list, and cannot be added in time to close this transaction, Buyer may select another law firm from lender's approved list to close this transaction
  (5) **Loan Obligations.** Buyer agrees to (a) make application for the loan within **N/A** _____ ( _____ ) days from the Binding Agreement Date, (b) immediately notify Seller of having applied for the loan and the name of the lender and (c) pursue qualification for and approval of the loan diligently and in good faith  Should Buyer not timely apply for the loan, Seller may terminate the Agreement if Buyer does not within five days after receiving written notice thereof, cure the default by providing Seller with written evidence of loan application  Buyer agrees that a loan with terms consistent with those described herein shall satisfy this loan contingency  Buyer may also apply for a loan with different terms and conditions and close the transaction provided all other terms and conditions of this Agreement are fulfilled, and the new loan does not increase the costs charged to the Seller  Buyer shall be obligated to close this transaction if Buyer has the ability to obtain a loan with terms as described herein and/or any other loan for which Buyer has applied and been approved  From the Binding Agreement Date until closing, Buyer shall not intentionally make any material changes in Buyer's ability to obtain a loan  In the event any application of Buyer for a loan is denied, Buyer shall promptly provide Seller with a letter from the lender denying the loan stating the basis for the loan denial

☐ **D. Second Loan to be Obtained,** see Exhibit "_____"

Copyright© 2002 by Georgia Association of REALTORS®, Inc     Revised 10/11/02 F23, New Construction Purchase and Sale Agreement, Page 1 of 5 01/01/02

**EXHIBIT B**

3. **Earnest Money.** *[Select section A or B below  The section not marked is not a part of this Agreement ]*

☒ A  Buyer has paid to_____ **Seller** _____ ("Holder") earnest money of
   $_____ check or $ **1 00** _____ cash  The earnest money shall be deposited in Holder's escrow/trust
   account (with Holder retaining the interest if the account is interest-bearing) within five banking days from the Binding Agreement
   Date and shall be applied toward the purchase price of the Property at the time of closing  In the event any earnest money check is
   not honored, for any reason, by the bank upon which it is drawn, Holder shall promptly notify Buyer and Seller  Buyer shall have
   three banking days after notice to deliver good funds to Holder  In the event Buyer does not timely deliver good funds, the Seller
   shall have the right to terminate this Agreement upon written notice to the Buyer  Holder shall disburse earnest money only as
   follows  (a) upon the failure of the parties to enter into a binding agreement, (b) at closing, (c) upon a subsequent written agreement
   signed by all parties having an interest in the funds, (d) upon order of a court or arbitrator having jurisdiction over any dispute
   involving the earnest money, or (e) upon a reasonable interpretation of this Agreement by Holder  Prior to disbursing earnest money
   pursuant to a reasonable  interpretation of this Agreement, Holder shall give all parties fifteen ( days notice, stating to whom the
   disbursement will be made  Any party may object in writing to the disbursement, provided the objection is received by Holder prior to
   the end of the fifteen day notice period  All objections not raised in a timely manner shall be waived  In the event a timely objection
   is made, Holder shall consider the objection and shall do one or more of the following  (a) hold the earnest money for a reasonable
   period of time to give the parties an opportunity to resolve the dispute, (b) disburse the earnest money and so notify all parties,
   and/or (c) interplead the earnest money into a court of competent jurisdiction  Holder shall be reimbursed for and may deduct from
   any funds interpleaded its costs and expenses, including reasonable attorneys' fees  The prevailing party in the interpleader action
   shall be entitled to collect from the other party the costs and expenses reimbursed to Holder  No party shall seek damages from
   Holder (nor shall Holder be liable for the same) for any matter arising out of or related to the performance of Holder's duties under
   this earnest money paragraph  If Buyer breaches Buyer's obligations or warranties herein, Holder may pay the earnest money to
   Seller by check, which if accepted and deposited by Seller shall constitute liquidated damages in full settlement of all claims of Seller
   It is agreed to by the parties that such liquidated damages are not a penalty and are a good faith estimate of Seller's actual
   damages, which damages are difficult to ascertain

OR

☐ B. Buyer has paid to Seller earnest money of $_____ check or $_____ cash in accordance with Exhibit " ___"

4. **Closing and Possession.**
   A. **Property Condition:** Seller shall deliver Property clean and free of debris at time of possession  If the Property is destroyed or
   substantially damaged prior to closing, Seller shall promptly notify Buyer of the amount of insurance proceeds available to repair the
   damage and whether Seller will complete repairs prior to closing  Buyer may terminate this Agreement not later than five days after
   receiving such notice by giving written notice to Seller  If Buyer does not terminate this Agreement, Buyer shall receive at closing
   such insurance proceeds as are paid on the claim which are not spent to repair the damage
   B. **Taxes.** Real estate taxes on said Property for the calendar year in which the sale is closed shall be prorated as of the date of
   closing  Seller shall pay State of Georgia property transfer tax
   C. **Closing Date and Possession:** This transaction shall be closed on _____ **November 14,** _____ , 20 **03** _ or on such other date
   as may be agreed to by the parties in writing, provided, however, that  (1) in the event the loan described herein is unable to be
   closed on or before said date, or (2) Seller fails to satisfy valid title objections, Buyer or Seller may, by notice to the other party (which
   notice must be received on or before the closing date), extend this Agreement's closing date and the Seller for surrender of occupancy
   if later than the closing date, up to seven days from the above-stated closing date  Buyer agrees to allow Seller to retain possession
   of the Property through *[Select sections A, B, or C below  The sections not marked are not a part of this Agreement.]*
      ☒ A  the closing, or ☐ B _____ hours after the closing, or ☐ C _____ days after the closing at _____ m  o'clock
   D. **Warranties Transfer:** Seller agrees to transfer to Buyer, at closing, subject to Buyer's acceptance thereof, Seller's interest in any
   manufacturer's warranties, service contracts, termite bond or treatment guarantee and/or other similar warranties which by their
   terms may be transferable to Buyer
   E. **Utility Services:** _____ **Seller** _____ shall cause all utility services to be operational  Buyer shall pay any and all costs and deposits
   required by the utility service companies to have services turned on in Buyer's name
   F  **Prorations:** Seller and Buyer agree to prorate all utility bills between themselves, as of the date of closing (or the day of possession
   of the Property by the Buyer, whichever is the later) which are issued after closing and include service for any period of time the
   Property was owned/occupied by Seller or any other person prior to Buyer
   G. **Closing Certifications·** Buyer and Seller shall execute and deliver such certifications, affidavits, and statements as are required at
   closing to meet the requirements of the lender and of federal and state law

5. **Title.**
   A. **Warranty:** Seller warrants that at the time of closing, Seller will convey good and marketable title to said Property by general
   warranty deed, subject only to  (1) zoning, (2) general utility, sewer, and drainage easements of record on the Acceptance Date upon
   which the improvements do not encroach, (3) subdivision and/or condominium declarations, covenants, restrictions, and easements
   of record on the Acceptance Date, and (4) leases and other encumbrances specified in this Agreement  Buyer agrees to assume
   Seller's responsibilities in any leases specified in this Agreement
   B. **Examination:** Buyer may, prior to closing, examine title and furnish Seller with a written statement of objections affecting the
   marketability of said title  If Seller fails to satisfy valid title objections prior to closing or any extension thereof, then Buyer may
   terminate the Agreement upon written notice to Seller, in which case Buyer's earnest money shall be returned  Good and marketable
   title as used herein shall mean title which a title insurance company licensed to do business in Georgia will insure at its regular rates,
   subject only to standard exceptions

Copyright© 2002 by Georgia Association of REALTORS®, Inc

C. **Survey:** Any survey of the Property attached hereto by agreement of the parties prior to the Binding Agreement Date shall be a part of this Agreement. Buyer shall have the right to terminate this Agreement upon written notice to Seller if a new survey performed by a surveyor licensed in Georgia is obtained which is materially different from any attached survey with respect to the Property, in which case Buyer's earnest money shall be returned. The term "materially different" shall not apply to any improvements constructed by Seller in their agreed-upon locations subsequent to Binding Agreement Date. Matters revealed in said survey shall not relieve the warranty of title obligations of Seller referenced above.

6. **Seller's Property Disclosure.** Seller's New Construction Property Disclosure Statement is attached hereto and incorporated herein. Seller warrants that to the best of Seller's knowledge and belief the information contained therein is accurate and complete as of the Binding Agreement Date.

7. **Soil Treatment Bond.** At closing, Seller shall provide Buyer a current Soil Treatment Certification/Bond. If any additional inspections and/or reports are requested by Buyer or Lender, any costs for such inspections and/or reports shall be paid by Buyer.

8. **Inspection.** Buyer and/or Buyer's representatives shall have the right to enter the Property at Buyer's expense and at reasonable times (including immediately prior to closing) to thoroughly inspect, examine, test, and survey the Property. ___Seller___ shall cause all utility services and any pool, spa, and similar items to be operational so that Buyer may complete all inspections under this Agreement. The Buyer agrees to hold the Seller and all Brokers harmless from all claims, injuries, and damages arising out of or related to the exercise of these rights. Buyer shall have the right to request that Seller repair and/or replace within a reasonable time prior to closing only defects in the property identified by Buyer's representative(s). The term "defects" shall mean any portion of an item in the Property which (1) is not in good working order and repair; (2) constitutes a nongrandfathered violation of applicable laws or governmental codes or regulations; (3) has not been substantially completed or constructed in substantial accordance with the plans and specifications, if any, for the Property; or (4) is a defect as that term is defined in any warranty provided by Seller. Seller agrees to correct the defects in a good and workmanlike manner prior to closing.

9. **Walk Through.** Prior to closing, Buyer and Seller shall inspect the Property and execute a "Walk Through List" specifying all items not constituting defects, that remain to be completed. Seller will make its best effort to timely complete after closing all items specified in the agreed-upon "Walk Through List." The fact that any repairs, touch ups, or adjustments are incomplete shall not constitute a valid reason for Buyer to fail or refuse to close, provided the same do not constitute defects.

10. **Other Provisions.**
    A. **Binding Effect, Entire Agreement, Modification, Assignment:** This Agreement shall be for the benefit of, and be binding upon, Buyer and Seller, their heirs, successors, legal representatives and permitted assigns. This Agreement constitutes the sole and entire agreement between the parties hereto and no modification or assignment of this Agreement shall be binding unless signed by all parties to this Agreement. No representation, promise, or inducement not included in this Agreement shall be binding upon any party hereto. Any assignee shall fulfill all the terms and conditions of this Agreement.
    B. **Survival of Agreement:** All conditions or stipulations not fulfilled at time of closing shall survive the closing until such time as the conditions or stipulations are fulfilled.
    C. **Governing Law:** This Agreement may be signed in multiple counterparts, is intended as a contract for the purchase and sale of real property and shall be interpreted in accordance with the laws of the State of Georgia.
    D. **Time of Essence:** Time is of the essence of this Agreement.
    E. **Terminology:** As the context may require in this Agreement, (1) the singular shall mean the plural and vice versa, and (2) all pronouns shall mean and include the person, entity, firm, or corporation to which they relate.
    F. **Responsibility to Cooperate:** All parties agree to timely take such actions and produce, execute, and/or deliver such information and documentation as is reasonably necessary to carry out the responsibilities and obligations of this Agreement.
    G. **Notices:** Except as otherwise provided herein, all notices, including offers, counteroffers, acceptances, amendments and demands, required or permitted hereunder shall be in writing signed by the party giving the notice and delivered (1) in person, (2) by an overnight delivery service, prepaid, (3) by facsimile transmission (FAX) (provided that an original of the notice shall be promptly sent thereafter if so requested by the party receiving the same) or (4) by the United States Postal Service, postage prepaid, registered or certified return receipt requested. The parties agree that a faxed signature of a party constitutes an original signature binding upon that party. Notice shall be deemed to have been given as of the date and time it is actually received. Notwithstanding the above, notice by FAX shall be deemed to have been given as of the date and time it is transmitted if the sending FAX produces a written confirmation with the date, time and telephone number to which the notice was sent. Receipt of notice by the Broker representing a party as a client shall be deemed to be notice to that party for all purposes herein, except in transactions where the broker is practicing designated agency, in which case, receipt of notice by the designated agent representing a party as a client shall be required to constitute notice. All notice requirements referenced herein shall be strictly construed.

11. **Disclaimer.** Buyer and Seller acknowledge that they have not relied upon any advice, representations or statements of Brokers and waive and shall not assert any claims against Brokers involving the same. Buyer and Seller agree that Brokers shall not be responsible to advise Buyer and Seller on any matter including but not limited to the following: any matter which could have been revealed through a survey, title search or inspection of the Property; the condition of the Property, any portion thereof, or any item therein; building products and construction techniques, the necessity or cost of any repairs to the Property; hazardous or toxic materials or substances, termites and other wood destroying organisms; the tax or legal consequences of this transaction; the availability and cost of utilities or community amenities; the appraised or future value of the Property; any condition(s) existing off the Property which may affect the Property; the

terms, conditions and availability of financing, and the uses and zoning of the Property whether permitted or proposed. Buyer and Seller acknowledge that Brokers are not experts with respect to the above matters and that, if any of these matters or any other matters are of concern to them, they should seek independent expert advice relative thereto. Buyer further acknowledges that in every neighborhood there are conditions which different buyers may find objectionable. Buyer shall therefore be responsible to become fully acquainted with neighborhood and other off site conditions which could affect the Property

## 12. Brokerage and Agency.

### A. Agency.

(1) In this Agreement, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and where the context would indicate the broker's affiliated licensees. No Broker in this transaction shall owe any duty to Buyer or Seller greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O C G A § 10-6A-1 et. seq

(2) Seller and Buyer acknowledge that if they are not represented by a Broker they are each solely responsible for protecting their own interests, and that Broker's role is limited to performing ministerial acts for either party;

(3) The Broker, if any, working with the Seller is identified on the signature page as the "Listing Broker", and said Broker is ☒, OR, is not ☐ representing the Seller;

(4) The Broker, if any, working with the Buyer is identified on the signature page as the Selling "Broker", and said Broker is ☐, OR, is not ☐ representing the Buyer; and

(5) If Buyer and Seller are both being represented by the same Broker, a relationship of either designated agency ☐, OR, dual agency ☐ shall exist.

    (a) **Dual Agency Disclosure** [*Applicable only if dual agency has been selected above*] Seller and Buyer are aware that Broker is acting as a dual agent in this transaction and consent to the same. Seller and Buyer have been advised that:
      1 - In serving as a dual agent the Broker is representing two clients whose interests are or at times could be different or even adverse,
      2 - The Broker will disclose all adverse, material facts relevant to the transaction and actually known to the dual agent to all parties in the transaction except for information made confidential by request or instructions from another client which is not otherwise required to be disclosed by law;
      3 - The Buyer and Seller do not have to consent to dual agency, and
      4 - The consent of the Buyer and Seller to dual agency has been given voluntarily and the parties have read and understood their brokerage engagement agreements
      5 - Notwithstanding any provision to the contrary contained herein Seller and Buyer each hereby direct Broker, while acting as a dual agent, to keep confidential and not reveal to the other party any information which could materially and adversely affect their negotiating position

    (b) **Designated Agency Assignment.** [*Applicable only if the designated agency has been selected above*]
The Broker has assigned_____to work exclusively with Buyer as Buyer's designated agent and _____to work exclusively with Seller as Seller's designated agent. Each designated agent shall exclusively represent the party to whom each has been assigned as a client and shall not represent in this transaction the client assigned to the other designated agent.

    (c) **Material Relationship Disclosure** The Broker and/or affiliated licensees have no material relationship with either client except as follows _____
(A material relationship means one actually known of a personal, familial or business nature between the Broker and affiliated licensees and a client which would impair their ability to exercise fair judgment relative to another client.)

**B.** **Brokerage.** The Broker(s) identified herein have performed valuable brokerage services and are to be paid a commission pursuant to a separate agreement or agreements. Unless otherwise provided for herein, the Listing Broker will be paid a commission by the Seller, and the Selling Broker will receive a portion of the Listing Broker's commission pursuant to a cooperative brokerage agreement. The closing attorney is directed to pay the commission of the Broker(s) at closing out of the proceeds of the sale. If the sale proceeds are insufficient to pay the full commission, the party owing the commission will pay any shortfall at closing. If more than one Broker is involved in the transaction, the closing attorney is directed to pay each Broker their respective portion of said commission. In the event the sale is not closed because of Buyer's and/or Seller's failure or refusal to perform any of their obligations herein, the non-performing party shall immediately pay the Broker(s) the full commission the Broker(s) would have received had the sale closed, and the Selling Broker and Listing Broker may jointly or independently pursue the non-performing party for their portion of the commission

13 **Time Limit of Offer.** This instrument shall be open for acceptance until_____o'clock_____m on the_____day of _____ 20_____

14. **Agreement to Arbitrate** Buyer and Seller agree that any unresolved claim arising out of or relating to this contract, or the breach thereof, or to any warranty of Seller (including earnest money disputes) shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The decision of the arbitrator shall be final and may be enforced by any court having jurisdiction thereof. The arbitration shall be conducted in accordance with O C G.A. § 9-9-1 et seq. Notwithstanding the above, if Buyer is claiming under a warranty provided by Seller, the terms and procedures of that warranty shall first apply to the resolution of the claim

Copyright© 2002 by Georgia Association of REALTORS®, Inc.    Revised 04/18/02 F23, New Construction Purchase and Sale Agreement, Page 4 of 5 01/01/02

In order for this paragraph to be a part of this Agreement it must be initialed by Buyer and Seller; if not initialed it shall be void and unenforceable

Seller Initials

Buyer Initials

15   **Exhibits And Addenda**   All exhibits and/or addenda attached hereto, listed below, or referenced herein are made a part of this Agreement. If any such exhibit or addendum conflicts with any preceding paragraph, said exhibit or addendum shall control
   **New Construction Exhibit**
   Special Stipulations, General Specifications

16   **Home Warranty.**   Except to the extent set forth below, Seller agrees to warrant the Property for a one (1) year period from the date of the closing against all defects in labor and materials (normal wear and tear excepted)

SPECIAL STIPULATIONS The following Special Stipulations, if conflicting with any exhibit, addendum, or preceding paragraph, shall control

   1 Seller and Buyer to draw up and additional contract for the purpose of finihings the terrace level and other additional items at the agreed upon price of $900,000 00 These items are to be completed by closing and the cost

☒ (Mark box if additional pages are attached )

R _____ ( _____ )
Selling Broker                          MLS Office Code

By _____
   Broker or Broker's Affiliated Licensee

Print or Type Name _____

Bus Phone _____ ( _____ FAX # _____ ( _____

Multiple Listing # _____ 763933 _____

COLDWELL BANKER RESIDENTIAL BR (   CBRB07   )
Listing Broker                          MLS Office Code

By _____ Bettina K. Davis _____
   Broker or Broker's Affiliated Licensee

Print or Type Name _____ BETTINA K. DAVIS _____

Bus Phone _770 642-0399_ FAX# | 770-594-2069 |

_____
Buyer's Signature

Print or Type Name _____ Gary Hill

_____
Buyer's Signature

Print or Type Name _____ Wanda Hill

_____
Seller's Signature

Print or Type Name _____ Building Trends

_____
Seller's Signature

Print or Type Name _____

**Acceptance Date**
The above proposition is hereby accepted, _____ o'clock _____ m on the _____ day of _____, 20 _____

**Binding Agreement Date**
This instrument shall become a binding agreement on the date ("Binding Agreement Date") when notice of the acceptance of this Agreement has been received by offeror   The offeror shall promptly notify offeree when acceptance has been received

Copyright© 2002 by Georgia Association of REALTORS®, Inc.          Revised 01/19/02 F23, New Construction Purchase and Sale Agreement, Page 5 of 5 01/01/02



# SPECIAL STIPULATIONS CONTINUED



**2002 Printing**

RESIDENTIAL BROKERAGE

Property Address:

3300 MOYE TRAIL

Duluth ,Georgia 30097

[NOTE: The language set forth in this special stipulation(s) is furnished by the parties and is particular to this transaction.]

1 Buyer and Seller mutually agree to draw up a "Remodeling Contract" for the purpose of finishing the terrace level and other items previously agreed upon for the additional price of $900,000. This "Remodeling Contract" must be signed and paid for on or before closing in order for this Agreement to be valid.

2 Buyer understands that any and all monies given to Seller is non-refundable unless Seller defaults on the terms specified in this Agreement.

3 All change orders shall be paid for at the time they are agreed upon by both Buyer and Seller.

4 Pool House is not included in this Agreement.

5 The following items are included in this Agreement Price at no additional charge to Buyer.
a Remove desk from loft area above kitchen
b Remove all existing ceiling fans.
c Change configuration of Master Bedroom cabinets.
d Antique glass or clear glass window in wine cellar.
e Add 1/2 column with cap between fixed doors to media room in the terrace level foyer area-similar to the column that is in the up foyer by the dining room windows.

6 The following items are not included in this Agreement but, if desired by Buyer shall be added by Change Order.
a Any changes or overages in the final plumbing selections.
b Any changes or overages in the final lighting selection.
c Remove wood mantles on fireplaces and replace with stone mantles in Master, Library and lower level bedroom
d Add kitchen desk with upper cabinets to match kitchen cabinets.
e Add leaded glass window above tub in master
f Add water purification system.
g Any changes or overages in outside lighting plan.
h Any changes or overages in landscape plan
i Any changes or overages of pool pavers or decking.
j Any changes or overages in terrace level flooring.

7 Coldwell Banker is to be paid a Real Estate Commission at closing in the amount of $50,000.00.

[ ] (Mark box if additional pages are attached.)

Selling Broker's Initials _____
(or Broker's Affiliated Licensee)

Listing Broker's Initials _____
(or Broker's Affiliated Licensee)

Buyer's Initials, _____ / _____

Seller's Initials _____ / _____

Copyright© 2002 by Georgia Association of REALTORS®, Inc

F21, Special Stipulations Continued  01/01/02

# BTI
## General Specifications

**Remaining Allowances:**
1. Foyer Floor: $12.00 PSF
2. Appliance Allowance: $15,000 total all kitchens
3. Light Fixtures, ceiling fans, bulbs, low voltage and rope lighting, dimmers: $35,000. BTI to supply fixtures.
4. Swimming Pool, pool decking and equipment: $55,000

All items for the terrace level will be handled under the "Remodeling Contract".

The following incomplete items are included in the Agreement Price"
a. Granite Counter tops are currently on order but Buyer shall have the right to change prior to being custom fitted for the cabinets. Should there be any cost involved in changing or modifying the ordered tops, it will be at Buyers expense.
b. All hardwood floors to have 1 coat of stain (Buyers Choice) and 2 finish coats.
c. Kitchen sink to be a stainless undermount.
d. 2 central vac systems to be installed.
e. Security system to be complete.
f. Study Trim detail to be mutually agreed upon by Buyer and Seller.

_____    _____
BUYER                         SELLER

_____
BUYER



# NEW CONSTRUCTION
# EXHIBIT " A "



RESIDENTIAL BROKERAGE

2002 Printing

This Exhibit is part of the Agreement with an Offer Date of __Sept....22__ , 2003 ____ for the purchase and sale of that certain Property

known as     **3300 MOYE TRAIL**     ._____ **Duluth** _____, Georgia_ **30097**

The stipulations set forth in this Exhibit shall, if conflicting with the printed portions of the New Construction Purchase and Sale Agreement to which it is attached, control. This Exhibit shall apply to the completion of the improvements on the property (hereinafter referred to as the "Property").

1  **Completion**  For the purposes of this Agreement, the Property shall be considered completed and ready to close upon issuance of a Certificate of Occupancy or Final Inspection Certificate covering the Property by the city or county in which the Property lies  Seller shall deliver to Buyer at closing a Certificate of Occupancy, or the appropriate equivalent or substitute for the Property. The Property shall be completed in accordance with all applicable governmental regulations, ordinances, and codes, and shall be in compliance with all applicable restrictions, covenants, and conditions, including without limitation, any public or private architectural controls and restrictions

2  **Plans and Specifications.**  *[Select A or B below  The section not marked is not a part of this Agreement ]*

  ☐ **A**  The home shall be constructed substantially in conformance with the Plans and Specifications initialed and approved by the Buyer, attached hereto as an Exhibit to this Agreement and by reference incorporated herein. Seller expressly reserves the right to make such changes in the Plans and Specifications as may be required by governmental authority or as may be required by job conditions as long as the size, overall quality and appearance of the house are substantially equal to or superior to that shown on the attached Plans and Specifications

## OR

  ☒ **B.**  If construction is not completed, the home shall be completed with the quality and finish comparable to _Other_____
  __homes in the Sugarloaf Community_____ in accordance with Seller's standard plans

3  **Association Fees.**  *[Select A, B or C below  The sections not marked are not a part of this Agreement ]*

  ☒ **A**  Mandatory.  Buyer acknowledges that there is a required association fee in the approximate amount of $ _1924 00_____ per year, prorated at closing, with an initiation fee of $ _none_____ .
  ☐ **B**  Not Mandatory.  Buyer acknowledges that there is not a required association fee
  ☐ **C**  No Association.  Buyer acknowledges that there is no association

4  **Inspection of the Property.**  Buyer agrees to limit inspections of the Property to a reasonable length of time during business hours  It is understood and agreed by all parties to this Agreement that Seller is not governed by outside inspections other than those required by governmental agencies  Buyer agrees to deal only with the designated representative of the company assigned by Seller to the Property and to limit communications with the representative to normal business hours. Buyer and Seller acknowledge that no Broker shall be responsible to monitor or supervise the construction of any of the improvements on the Property and that such tasks clearly fall outside the scope of real estate brokerage services.

5  **Household Goods.**  The movement of any household goods or other materials by Buyer into the home will not be permitted until the home has been completed and the total sales price has been paid in full

6  **Contractors and/or Suppliers.**  All work and materials to be performed or supplied under this Agreement shall be performed and supplied by Seller's own contractors, subcontractors, employees, agents, material men and suppliers  Buyer shall not have the right to have any work performed or supplies delivered to the Property at Buyer's own direction prior to closing

7  **Manufacturers' Warranties.**  At Closing, Seller agrees to transfer to Buyer Seller's interest in all manufacturers' warranties and similar warranties which by their terms are transferable to Buyer.

8  **Walk Through**  Prior to Closing, Buyer and Seller's representative shall "Walk Through" the home and execute a "Walk Through List" specifying the items that remain to be completed in the home  Buyer acknowledges that Seller will make its best effort to complete all of the items specified in the agreed upon "Walk Through List" on a timely basis as soon as reasonably possible after closing, but the fact that any repairs, touchups or adjustments are incomplete shall not constitute a valid reason for Buyer's failure to close.  Buyer further agrees that there shall be no withholding of any or all of Seller's proceeds at Closing for any such "Walk Through List" items without the written approval of the Seller  Seller shall not accept from Buyer or Broker "Walk Through Lists" of items to be completed until the official

"Walk Through" is conducted with Seller's representative prior to Closing  Buyer acknowledges that the only criteria that will be used to compile the "Walk Through List" are set forth in the warranty described above and if no criteria are set forth, either as part of the warranty or in the event there is no written warranty, then customary and generally accepted area building industry criteria or standards will be used to compile the "Walk Through List".  Buyer also acknowledges that Seller is not required and will not perform any work which would exceed the approved or generally accepted criteria

9. **Decorative Selections.** If there are decorative selections yet to be selected in the completion of the residence, Buyer shall have the option to make those selections from available stock at Seller's normal sources of supply  Buyer understands that it is Buyer's responsibility to make all selections by the dates provided and further understands that if the selections have not been made by the agreed date, that Seller, at Seller's option, may make such missing selections for Buyer and same are hereby deemed agreed to and acceptable to Buyer

10 **Change Orders**  Buyer agrees that any request for changes or alterations ("change orders") to the residence will be set forth in writing and delivered to Seller at Seller's office  Any requested change order must be in writing and signed by Buyer and Seller  No subcontractor, workman or material men has authority to agree on behalf of Seller to any change order  Buyer agrees that all change order requests must be presented to Seller so as to allow Seller adequate lead time to schedule the change orders into the normal building sequence  Seller has the right to refuse to make changes/alterations that are requested  Buyer agrees to pay Seller in advance of the performance of work necessitated by agreed change orders and further understands that there will be no refunds, under any circumstances, of payments made by Buyer for change orders  Seller will not accept any change order request within thirty days of closing  Buyer further acknowledges that any work done on the home pursuant to change orders or additions may not increase the appraised value of the Property.  Seller shall not be responsible if increases in the price of the Property due to change orders or additions are not reflected in the appraised value of (and resulting available loan for) the Property

11 **Delays**  Seller shall have no liability for any delays in construction caused by strikes, acts of God or nature, or delays directly caused by Buyer's change orders and/or selection of materials  **In the event of such delays, the closing date may be extended, in the sole discretion of the Seller, by the number of days resulting from such delays, not to exceed thirty calendar days; Seller shall notify all parties immediately, in writing, of the cause and the new closing date.**

12 **Insulation**  Insulation has been installed (or will be installed prior to closing) in accordance with the terms of this paragraph
  A  Exterior walls are insulated with **Cellulose**_____ insulation to a thickness of **6-8**_____ inches which will, according to the manufacturer, yield an R-value of **R-13**____
  B  Ceilings below attic areas are insulated with **Cellulose**_____ insulation to a thickness of **8**_____ inches which will, according to the manufacturer, yield an R-value of **30**_____
  C  Vaulted ceilings are insulated with **Cellulose**_____ insulation to a thickness of **6 1/2**_____ inches which will, according to the manufacturer, yield an R-value of **22**_____
  D  Floor overhangs are insulated with **Cellulose**_____ Insulation to a thickness of **8**_____ inches which will, according to the manufacturer, yield an R-value of **R-22**_____

13 **Allowances**  Listed below are the allowances for those items that Buyer shall select  If Buyer should exceed or go under these allowances, the final reconciliation between Buyer and Seller will be handled at closing  However, in the event an allowance amount is substantially exceeded by Buyer, Seller, at his option, may require collection of the additional amount pursuant to the provisions of the Change Orders paragraph above  Fill-in the blanks only for those items which are presently not complete  All other blanks are not a part of this paragraph
All allowances shall include all applicable taxes and installation unless otherwise noted

  A  Wallpaper  $_____ per single roll (material only, Seller to install)  Location _____

  B  Carpet    $_____ per_____ including pad  Location _____

  C  Vinyl     $_____ per_____  Location _____

  D  Tile $     _____ per_____  Location _____

  E  Foyer Floor  $_____ Type _____

  F  Light Fixtures  $_____ including chimes and bulbs  Location _____

G   Landscaping: $ _____

H   Appliances: (where applicable)

| | | | |
|---|---|---|---|
| Trash Compactor | $_____ | Make/Model #_____ | Color_____ |
| Disposal | $_____ | Make/Model #_____ | Color_____ |
| Dishwasher | $_____ | Make/Model #_____ | Color_____ |
| Oven | $_____ | Make/Model #_____ | Color_____ |
| Double Oven | $_____ | Make/Model #_____ | Color_____ |
| Stove | $_____ | Make/Model #_____ | Color_____ |
| Microwave | $_____ | Make/Model #_____ | Color_____ |
| Refrigerator | $_____ | Make/Model #_____ | Color_____ |
| Other | $_____ | Make/Mode #_____ | Color_____ |

I   Other

   **See attached Specifications for all allowances**

All other selections made by Buyer shall be within Seller's normal allowances if no specific dollar figure has been so set. In the selection of materials and equipment by Buyer, every reasonable attempt will be made to make such selections from stock on hand or immediately available.

Selling Broker's Initials _____
(or Broker's Affiliated Licensee)

Listing Broker's Initials _____
(or Broker's Affiliated Licensee)

Buyer's Initials _____ / _____

Seller's Initials _____ / _____